**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Case No. 21-087(1) (TJK)** |
| **MICHAEL SPARKS,** | |
| **Defendant.** | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION TO SEVER

The United States of America respectfully submits this response in opposition to defendant Michael Sparks's Motion to Sever Defendants, Dkt. No. 52 ("Motion").  Sparks speculates that a joint trial with his co-defendant Joseph Howe (with whom he was properly joined) would prejudice him, and argues that therefore the Court should exercise its discretion under Federal Rule of Criminal Procedure 14(a) to sever the defendants for separate trials.  But Sparks points to no specific trial right that is in jeopardy, nor to any reason the jury might be confused or unable to render independent verdicts based on the evidence.  The Court should deny Sparks's motion.

## FACTUAL BACKGROUND

### A.    Sparks's and Howe's Involvement in the Events of January 6, 2021

Michael Sparks and Joseph Howe were coworkers at a company in Elizabethtown, Kentucky.  After the November 2020 Presidential election, Sparks took to Facebook and began sharing posts about election fraud and an eventual victory by then-president Trump.  On November 8, 2020, Sparks posted a link to a statement by Trump with the comment, "We the people are with you 70million strong . Let us know if we need bear arms[.]"

On December 12, 2020, Sparks and Howe traveled to Washington, D.C. together to attend a rally in support of Trump.  Photos obtained from Sparks's cell phone show him and Howe posing

for pictures at the National Mall.  Sparks photographed some of the speakers, including Mike Lindell (the CEO of My Pillow, Inc., and at the time a prominent advisor to Trump), and of the crowd, in which people carried flags and at least one banner declaring, "Stop the Steal."  Sparks's Facebook posts about the weekend described, "[w]e had a great weekend at Washington DC supporting what we believe in ."

On January 3, 2021, Sparks posted a comment to Facebook, "It's time to drag them out of Congress . It's tyranny[.]"  Sparks, Howe, and a group of their coworkers planned a trip to D.C. for the January 6 "Stop the Steal" rally.  According to the co-workers, some of whom have been interviewed by the FBI, the group traveled together in a single van, which Sparks rented.  They left after work on January 5, 2021, and drove through the night, then made their way to the rally after parking the van at a garage.  According to these witnesses and confirmed by photos from the event, the group attended the rally together.  Metadata from Sparks's cell phone shows they arrived by 10:00 a.m.

After the rally, the group began making their way to the U.S. Capitol.  Some members of the group were separated from the others.  But Sparks and Howe stayed together, walking down the lawn to approach the Capitol from the west side.  As they walked, Sparks and Howe were captured on film by a cameraman who engaged them in conversation.  Sparks was on the cameraman's left and Howe on the right, and as all three walked closer to the Capitol, Howe explained their intentions, "We're getting in that building."  Sparks added, "if [Vice President Pence] does his job today, he does the right thing by the Constitution, Trump's our president four more years."  Excerpts of the video are below (*Sparks, left, and Howe, right*):



As they approached the Capitol building, Sparks and Howe were both prepared for violence.  Both appear to be wearing tactical vests under their coats.  (A vest that appears to be the same vest Howe wore inside the Capitol building was recovered from the firing range at his home in October 2022.)  Howe also had goggles and a gas mask, and what appears to be a can of pepper spray or chemical irritant.

When they arrived at the Capitol grounds, Sparks and Howe made their way through the crowd and into the large scaffolding structure that covered the Northwest steps approaching the building.  As Howe climbed the stairs, he grabbed a police shield from the hands of an officer attempting to block the crowd.  A line of USCP officers were attempting to hold back the crowd at the middle-level landing, where the scaffolding ended before the second flight of stairs. The police were successful for a period of time, in part because they had bike rack barriers to help block the crowd, as shown below (*Howe, center left with red arrow*).



But as seen in the video excerpted above, the rioters in that area were working to take the bike racks away and force through that police line. Howe and Sparks were at the front of this group of rioters. Howe was recorded pulling out a collapsible ASP baton that appears to be the same model used by the Capitol Police, as excerpted below (*zoomed in*).



It appears Howe retracted the police baton and store it in his pocket. Howe was also seen deploying his cannister of what appears to be pepper spray in the direction of the police at the top of the stairs, shown below (*Howe, with face and gloved hand holding cannister circled in yellow*).

4



Although Sparks has not yet been located in the frame of video excerpted above, he was in the immediate area and is seen at other times in similar footage. Video taken by individuals in the crowd, including videos in which Sparks can be seen, show members of the mob physically assaulting law enforcement officers, grabbing and yanking at their barricades, spraying them with chemical sprays, and interfering with their efforts to control the riot—all within view of Sparks. The crowd soon broke through the police barricade, and shortly after these events Sparks and Howe can be seen together on the landing just a few steps from where Howe deployed his chemical spray. Video taken by members of the crowd show Sparks and Howe in conversation as they waited for the next opportunity to advance, as shown below (*Sparks, left, with yellow arrow, and Howe, right, with red arrow*):



Moments later, Sparks and Howe, along with other members of the mob, surged ahead and rushed further up the stairs. CCTV footage shows Sparks and Howe just a few feet away from one another, as shown below.  As they climbed the stairs, Sparks ran ahead.  Howe was right behind him, and as he ran up following Sparks, he pushed a Capitol police officer, as shown below (*Sparks, left, and Howe, right*).



Both Sparks and Howe continued up the stairs and were some of the first rioters to reach the last line of police defending the Upper West Terrace and the Senate Wing Door. The mob shoved more bike rack fencing out of the way and forced the USCP officers to retreat, then quickly advanced on the building itself.  Rioters began smashing the windows and banging on the doors in the immediate vicinity and full view of Sparks and Howe.  One rioter, Dominic Pezzola, Case No. 21-cr-175, used a police shield to break the window next to the Senate Wing Door.  As he did so, Howe was steps away; he kicked the door itself (the windows of which had already been smashed) in what appears to be an effort to break inside, then made his way over to the window as it was being broken, as shown below (*Howe at far right*):



After the window was smashed in, Sparks climbed up and positioned himself to jump inside, as shown below (*Sparks, center left*).  A lone U.S. Capitol Police Officer confronted him from inside the building (*circled in green*).



The officer, facing an angry mob armed with weapons and demonstrably prepared to do violence, opted against using his firearm; instead, he deployed a small canister of pepper spray that did little to deter Sparks from advancing, shown below:



Howe entered through the Senate Wing Door the same minute Sparks jumped through the window, at 2:13 p.m.

Once inside, Sparks headed toward the Senate, where he joined a mob of rioters confronting U.S. Capitol Police Officer Eugene Goodman. Officer Goodman was alone and outnumbered when he came upon the first group of rioters to breach the building at the bottom of the East Grand Stairs. Officer Goodman ordered the crowd to stop, and held his hand on his holstered firearm, indicating that he was armed. Despite the officer's warnings, the mob advanced and pursued him. Officer Goodman was forced to retreat up the stairs. As the crowd chased him closer to the Senate chamber, they yelled out threats, "Keep running, motherf*cker," and "He's one person, we're thousands." The chase stopped only when backup arrived to assist Officer Goodman. Although the officers ordered the crowd to "leave, now," Sparks ignored the commands and continued advancing. He yelled, "This is our America! This is our America!," as he grew increasingly agitated, pointing as he continued his pursuit, as shown below:



The police formed a line to block the rioters' path and protect the senators who were sheltering in place in the Senate chamber just on the other side of the doors in that hallway.  At this time, around 2:17 p.m., the senators had not yet evacuated and the rioters were perilously close to their target. Sparks was at the front of the growing mob in that corridor, engaging directly in the faces of the officers there, as shown below:



In the meantime, while Sparks went north at 2:13 p.m., Howe headed south toward the center of the building.  He advanced with the crowd through the Crypt and on to the area near the Memorial Door, where he found and then took hold of a U.S. Capitol fire extinguisher that had been on the ground in that area, as shown below (*Howe, who had removed his jacket, at top left*). Moments later, the fire extinguisher was set off, causing chaos and forcing the police officers to briefly abandon their efforts to keep back the crowd.



Sparks and Howe left the Capitol building that afternoon, and eventually returned to the parking garage where they met up with the rest of their travel companions.  The group took the rented van to a hotel and spent the night in the D.C. area.  They turned on the news, and saw footage of the riot at the Capitol, including images of Sparks inside the building.  The group returned home to Kentucky the next day.

###### B.      The Charges Against Sparks and Howe

Sparks and Howe are charged together in the lead count of the Superseding Indictment, which was filed on November 9, 2022 (Dkt. 39), charging them with Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count One).  This is the most serious charge in the indictment and carries a maximum sentence of 20 years in prison.  Sparks and Howe are also charged together with Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count 12), and Parading, Demonstrating, or Picketing in a Capitol building, in

violation of 40 U.S.C. § 5104(e)(2)(G) (Count 14).  Each defendant is charged with Civil Disorder, in violation of 18 U.S.C. §§ 231(a)(3) and 2, though they are charged separately in two different counts (Count Two relating to Sparks; Count Three relating to Howe).  Sparks and Howe are each charged with Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1) and Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), with additional allegations of violating § 1752(b)(1)(A) applicable to Howe for his use and carrying of the baton and the fire extinguisher (Counts Seven, Eight, Ten, and Eleven).

Separately, Howe is charged with two counts of Assaulting, Resisting, or Impeding Certain Officials and Aiding and Abetting, in violation of 18 U.S.C. §§ 111(a)(1) and 2; one relating to his grabbing the shield from Officer A.C. (Count Four), and one relating to his shoving the unidentified officer up the Northwest steps (Count Five).  Howe is also charged with Destruction of Government Property and Aiding and Abetting, in violation of 18 U.S.C. §§ 1361 and 2 (Count Six), relating to the Senate Wing Door, which he kicked at the same time Sparks was jumping through the smashed-in window.  Finally, Howe is charged with Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A) (Count Nine) and Engaging in an Act of Physical Violence in the Capitol Grounds or Any of the Capitol Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Thirteen).

### C.    Anticipated Trial Evidence

At trial, the government expects that most of the evidence presented will relate directly to both defendants.  Evidence about their trip to D.C. in December 2020, which will come from witness testimony, Sparks's cell phone photographs, and Facebook records, will help to establish

both defendants' knowledge and intent to obstruct the official proceeding in Congress on January 6, 2021.  Evidence about their planning for the 2021 trip to D.C., their travel from Kentucky, and their discussions with travel companions, including testimony from witnesses that both Sparks and Howe used tactical gear like ballistic vests, will similarly establish the intent of both defendants. Throughout the morning and into the afternoon of January 6, Sparks and Howe stuck together, and they appear in the same video and photos that will be presented at trial to show their journey from the rally on the National Mall up to the Capitol building, through the battleground on the Northwest steps, and up to the threshold of the building itself, where they together watched and participated as rioters smashed and forced their way into the building.

Specifically, the evidence against both defendants will include testimony from many of the same witnesses, including from lay witnesses who traveled to D.C. with Sparks and Howe, law enforcement officers who can describe the scenes that played out in the areas where both Sparks and Howe were together, and "overview" witnesses who will establish common elements such as the ongoing civil disorder and its interference with federally protected functions and interstate commerce (to establish the alleged violations of 18 U.S.C. § 231), the certification of the electoral college votes (to establish the alleged violation of 18 U.S.C. § 1512), the restricted perimeter established by the Capitol Police and U.S. Secret Service (to establish the alleged violations of 18 U.S.C. § 1752), and other elements of each offense.

Moreover, the evidence against both defendants will include many of the same documentary evidence, including photos and videos taken by other individuals in the crowd that show both Sparks and Howe, and including records obtained from Sparks's cell phone and social media accounts that relate to both Sparks and Howe, and vice versa.  To prove the alleged crimes

committed by Howe, for example, the government will introduce photos found on Sparks's phone and records of text messages between Sparks and Howe.

## ARGUMENT

### A.      Legal Standard for Severance

There is a distinct preference in the federal system for joint trials of co-defendants properly joined in a single indictment.[1]  *Zafiro v. United States*, 506 U.S. 534, 537 (1993).  Defendants "may seek severance under [Federal Rule of Criminal Procedure] 14, which provides that '[i]f the joinder of offenses or defendants . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.'" *United States v. Wilson*, 605 F.3d 985, 1015 (D.C. Cir. 2010) (quoting Fed. R. Crim. P. 14(a)).  But while Rule 14 *permits* severance in the Court's discretion, the Rule does not *require* it—even when the defendant has demonstrated prejudice from a joint trial.  *Zafiro*, 506 U.S. at 538-39.  Courts "should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  *Id*.  Indeed, the Court retains "significant flexibility to determine how to remedy a potential risk of prejudice, including ordering lesser forms of relief such as limiting jury instructions." *United States v. Bikundi*, 926 F.3d 761, 780 (D.C. Cir. 2019) (citing *United States v. Moore*, 651 F.3d 30, 95 (D.C. Cir. 2011)); *see United States v. Butler*, 822 F.2d 1191, 1194 (D.C. Cir. 1987) (acknowledging trial judges are given great latitude to balance interests, including to preserve judicial and prosecutorial resources, and denying defendant's motion to sever).

"District courts should grant severance" under Rule 14 "sparingly because of the 'strong

---

[1] Sparks raises no Rule 8(b) challenge, claiming only that Rule 14(a) requires severance.

interests favoring joint trials, particularly the desire to conserve the time of courts, prosecutors, witnesses, and jurors.'" *United States v. Celis*, 608 F.3d 818, 844 (D.C. Cir. 2010) (quoting *United States v. Mardian*, 546 F.2d 973, 979 (D.C. Cir. 1976) (*en banc*)).  Although the Rule's language is permissive, allowing for severance when joinder "appears to prejudice a defendant," "the discretion afforded to district courts must be exercised with appreciation of the policy reasons favoring joinder[,]" *United States v. Bikundi*, 14-cr-30 (BAH), 2016 WL 912169, at *46 (D.D.C. Mar. 7, 2016), which include "promot[ing] efficiency and serv[ing] the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Zafiro*, 506 U.S. at 537.  In fact, the D.C. Circuit has instructed that for severance to be proper "[t]here must be a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Bostick*, 791 F.3d 127, 152-53 (D.C. Cir. 2015) (citation and punctuation omitted); *see also United States v. Glover*, 681 F.3d 411, 417 (D.C. Cir. 2012) (affirming district court's denial of defense motion to sever trial citing same standard).

Accordingly, severance is not required simply because a defendant might have a better chance of acquittal if tried separately.  *See United States v. Halliman*, 923 F.2d 873, 884 (D.C. Cir. 1991).  Salient factors the Court should consider, and which militate against severance, include whether separate trials would involve (1) the presentation of the same evidence; (2) testimony from the same witnesses; and (3) the same illegal conduct. *See United States v. Manner*, 887 F.2d 317, 325 (D.C. Cir. 1989) (citing *United States v. Sutton*, 801 F.2d 1346, 1365 (D.C. Cir. 1986)).  When these factors are present, the risk of prejudice is mitigated, *see Sutton*, 801 F.2d at 1365, and the policy reasons favoring joinder are heightened.

In *United States v. McCaughey*, a case arising from the Capitol siege on January 6, 2021,

defendants joined together in a single indictment unsuccessfully sought severance on the grounds that "the jury's revulsion at" co-defendants' actions such as spraying officers with chemicals and striking officers with batons "will spill over into the jury's consideration" of their own conduct. 605 F.Supp.3d 84, 90 (D.D.C. 2022).  Judge Trevor McFadden denied the motion to sever, finding "no dramatic disparity of evidence" and, in any event, finding that a jury would have little trouble compartmentalizing the evidence against each individual defendant in part because the actions were captured on video.  *Id.* at 91 (noting, also, that the defendants requesting severance "were hardly wallflowers during the events of January 6").

Where a defendant seeks severance based on a claim that a disparity in the evidence would prevent the jury from rendering independent verdicts, courts have allowed severance only on very rare occasions.  In *United States v. Sampol*, 636 F.2d 621, 645 (D.C. Cir. 1980), for example, the D.C. Circuit found the risk of "spillover" required severance in the prosecution arising from the assassination of the former Chilean ambassador to the United States, where the defendant seeking severance was charged only with false statements and misprision of felony while his co-defendants were tried for conspiracy, first-degree murder, and murder using explosives to blow up a vehicle. There, the court found severance was required not only because it was "apparent" that the defendant's "guilt or innocence might well be confused with that of his co-defendants" because of the huge disparity in the magnitude of the crimes charged, but also because of a *Bruton* violation in the admission of his co-defendants statements that prevented the defendant from effectively exercising his Sixth Amendment rights.  *Id.* at 643; *see also United States v. Franklin*, No. CR 04-128 (RMC), 2005 WL 8157514, at *15 (D.D.C. Dec. 16, 2005) (exercising court's discretion to sever one of 19 co-defendants charged with participating for "a single day" in seven-year-long narcotics conspiracy, where co-defendants were "charged with violent substantive offenses

including first-degree murder" in connection with several deaths).

### B.   Severance is Unwarranted and Unnecessary in this Case

Sparks and Howe participated in much the same conduct, with the same purpose, as part of the same group of friends, as proven by much the same evidence.  Sparks's request for severance should be denied.

First, Sparks's culpability is not "markedly different" from Howe's as he claims.  Motion at 4.  While Sparks is not charged with assault, the evidence against Sparks will show him chasing a lone and totally outnumbered police officer, ignoring commands to stop, and joining a mob shouting, "Keep running, motherf\*ucker," and threatening the officer, "He's one person, we're thousands."  Just outside the Senate chamber, Sparks shouted at police officers, closing in on them and yelling into their faces as he pointed.  This threatening behavior is not significantly less "inflammatory" than Howe's bad deeds, even if Sparks, unlike Howe, did not physically touch the officers he intimidated and pursued.  And while Sparks is not charged with destruction of property, the evidence against Sparks will show that he eagerly used the destruction of property happening all around him to his own advantage, and was the first to climb through the smashed-in window near the Senate Wing Door after watching others break the glass and create the opening he seized.  This behavior also is no less "inflammatory" than Howe's efforts to kick in the Senate Wing Door a few feet away.

In addition, the nature of the charges is not significantly different.  Sparks and Howe are charged together with the most serious offense and the crime that carries the most significant sentencing consequences and the most significant sentencing guidelines exposure, 18 U.S.C. § 1512(c)(2).  Both Sparks and Howe are alleged to have together obstructed the official proceedings in Congress at the Capitol on January 6.  The remaining charges, including felonies and misdemeanors charged against Sparks and Howe separately and collectively, are all

fundamentally related to their joint effort to stop the certification proceedings in Congress.   In short, there is no significant disparity in the conduct to be assessed by the jury by each defendant.

Second, there is nothing about the evidence here that would confuse the jury or make it difficult to render an independent verdict against each defendant.   Sparks's conduct was captured on video, making it easy to compartmentalize the evidence against him.   *See McCaughey*, 605 F.Supp.3d at 91.   Violence surrounded everyone who stormed the Capitol in the first wave of rioters to enter the building.   Accordingly, even in a separate trial against only Sparks, the jury would necessarily see evidence of hundreds of individuals committing acts of violence against the police.   Sparks was in the middle of a riotous mob, and the evidence against him will include certain acts of violence that are captured in the same videos that show his own conduct.   And this evidence is not ancillary or unnecessary to Sparks's trial: his proximity to the violence is relevant to establishing his own knowledge and intent; further, the acts of violence occurring at the Capitol are an essential element of the crime of civil disorder under 18 U.S.C. § 231.   *See*, *e.g.*, *United States v. Jensen*, Crim. No. 21-6 (D.D.C.), Jury Instructions, Dkt. 97 at 21 (filed Sept. 23, 2022) (defining elements of Civil Disorder and requiring proof of a "public disturbance involving acts of violence by groups of three or more persons" that caused immediate danger of injury).   The evidence against Howe is simply not "far more damaging" than the evidence against Sparks, as Sparks suggests, and there is no reason to conclude that the jury could not "reasonably compartmentalize the evidence introduced against each individual defendant."   *See Halliman*, 923 F.2d at 884 (internal quotations omitted).   A limiting instruction will alleviate any risk of confusion or prejudice here.   *See Zafiro*, 506 U.S. at 539.

Most of the evidence will show that Sparks and Howe were together and acting together. This evidence would be admissible even at a separate trial of Sparks alone.   And at the point Sparks

and Howe separate, after they violently entered the Capitol building, the evidence will become easy for the jury to differentiate. As Sparks chased Officer Goodman up the East Grand Stairs to accost him and other U.S. Capitol Police officers in the Ohio Clock Corridor, Howe was on the first floor accosting police officers with a found fire extinguisher near the Memorial Door. Their separate paths through the Capitol are well-documented on video, and easy for any jury to distinguish.

Third, much of the evidence against Sparks overlaps with the same evidence against Howe, demonstrating that severance is unnecessary because a trial against Sparks alone would involve much of the very same evidence presented at the joint trial.[2] Sparks and Howe are captured on the same video footage throughout the day, including at the morning rally, traveling to the Capitol grounds, and approaching the Capitol building itself. The evidence at trial, as set forth above, will involve a great deal of overlapping witness testimony (by lay witnesses, percipient law enforcement witnesses who were at the Capitol and interacted with the defendants, and investigating agents who seized and searched the defendants' digital media and found interrelating evidence), video footage, photographs, and text message and social media communications. The "strong interests favoring joint trials, particularly the desire to conserve the time of courts, prosecutors, witnesses, and jurors," weigh heavily in favor of a joint trial here. *Celis*, 608 F.3d at 844 (internal quotation omitted).

Sparks cites *Manner*, 887 F.2d at 325, *Halliman*, 923 F.2d at 884, and *United States v. Hernandez*, 780 F.2d 113 (D.C. Cir. 1986), in support of his severance request. Motion at 3-4. None of these cases supports his argument, and in fact each one arrived at the opposite result. In

---

[2] Sparks claims that "inflammatory evidence" would be admitted against Howe that would be inadmissible against Sparks in a separate trial, Motion at 2, but he fails to identify any specific piece of such evidence.

*Manner*, the D.C. Circuit affirmed the district court's denial of severance, noting that the cases "required presentation of much the same evidence, testimony of the same witnesses, and … the same illegal acts," 887 F.2d at 325 (quoting *Sutton*, 801 F.2d at 1365; quotation marks removed), and the jury was given a proper limiting instruction, leaving "no undue risk" of prejudice.  *Id.* Similarly, in *Halliman*, the D.C. Circuit affirmed the denial of severance of two defendants who were not charged with any common counts, noting that even if some evidence of narcotics distribution would not have been admissible at separate trials, there was no unfair prejudice and only minimal risk of jury confusion, particularly when the jury was instructed to consider each defendant's guilt or innocence separately.  923 F.2d at 884.  And in *Hernandez*, the D.C. Circuit found no error in the district court's refusal to sever co-defendants charged with firearms offenses, even though some of the evidence should have been excluded under Federal Rule of Evidence 404(b) and therefore the conviction of one of the two defendants was reversed.  780 F.2d at 120. Had the trial court limited the admission of other-acts evidence to just the applicable defendant and given an appropriate limiting instruction, the court opined that such an instruction might have cured even the improper 404(b) evidence.  *Id*.  But "there was no great disparity of the evidence" and the court found "no error in the District Court's denial of" severance.  *Id.*

Sparks argues that the jury's passions will be inflamed by evidence of Howe's actions, but he never explains why—even if that were true—the jury would then be led to "inevitably paint Mr. Sparks" with the same brush[.]"  Motion at 2.  For all the reasons set forth above, there is no reason to assume that is true.  Sparks has demonstrated no prejudice.  And he has not pointed to any specific trial right that might be compromised by a joint trial, much less any "serious risk" of such compromise that could not be mitigated by a limiting instruction to the jury.

## **CONCLUSION**

Given the strong interest in judicial efficiency and consistency presented by a joint trial and the lack of showing of any prejudice, the defendants should be tried together and Sparks's motion to sever should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


*/s/ Emily W. Allen*
EMILY W. ALLEN, Cal. Bar No. 234961
SONIA MITTAL
Assistant United States Attorneys
601 D Street NW
Washington, DC 20530
(907) 271-4724