UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 21-CR-87(1) (TJK) |
| | : | |
| MICHAEL SPARKS, | : | |
| | : | |
| Defendant. | : | |

**UNITED STATES' MOTION IN LIMINE TO PRECLUDE
IMPROPER DEFENSE ARGUMENTS AND EVIDENCE**

**I.     INTRODUCTION**

The United States of America moves *in limine*, pursuant to Federal Rules of Evidence 401, 403, and 611(b), to preclude the defendant from introducing evidence or making arguments:

(A)   on the specific location of security cameras in the U.S. Capitol;

(B)   on specific Secret Service tactics and emergency operations;

(C)   that his conduct was authorized by former President Trump or other officers or officials;

(D)   that any inaction by law enforcement permitted his conduct or impacted his state of mind;

(E)   that the First Amendment permitted his conduct;

**II.     FACTUAL BACKGROUND**

Sparks was the very first rioter to enter the U.S. Capitol building on January 6, 2021. Despite others' screams of "don't go in," Sparks climbed through the broken window next to the Senate Wing Door at approximately 2:13 pm. Once inside, he followed a group of men who chased a U.S. Capitol Police officer up a flight of stairs inside the Capitol building. Sparks and the others pursued the officer up the stairs, while the mob shouted at the officer. Upstairs, the officer found backup, and several police officers assisted him and attempted to stop the group of rioters. The

officers ordered the group to leave, but Sparks did not retreat. Instead, he walked to the front of the group and confronted the first officer they had chased up the stairs. He yelled, "This is our America! This is our America!," as he grew increasingly agitated.

Sparks did not find himself at the front of the mob by accident. In the days leading up to January 6, he posted to Parler, "we want a civil war to be clear." He bought a 22-caliber heavy barreled semiautomatic rifle and a scope. On January 3, 2021, he posted to Facebook, "It's time to drag them out of Congress . It's tyranny[.]" Sparks was well-informed about Congress's plan to certify the votes of the electoral college on January 6, even posing the question to his Parler community, "If we have to have one person from the house to contest the electoral on the 6 th who will it be[?]" He spread the news to his Facebook friends that Donald Trump had a "Path to Victory, Starting Jan. 6[.]"

As the events of January 6 unfolded before the world, Sparks's involvement was prominent, and he quickly made the news. Individuals who knew him reported his activity to law enforcement. One reported that he or she was concerned about messages Sparks posted on Facebook after January 6, 2021. In one ominous message, Sparks warned, "A new dawn is coming. Be ready. Just pray and trust in the Lord." He claimed he was canceling his Facebook account and had "give[n] up on democracy." He warned readers to "be ready for a lot of big events. Have radios for power loss etc. Love every body[.]" As late as January 16, 2021, he posted to Facebook, "go ahead and start conditioning your self for trump 4 more years."

Sparks was arrested in late January 2021. He is now facing trial, which begins on February 26, 2024, for obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2); civil disorder, in violation of 18 U.S.C. § 231(a)(3); entering or remaining on restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); disorderly conduct in a Capitol

building, in violation of 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G). ECF 39 (Second Superseding Indictment).

### III. LEGAL BACKGROUND

The Court has the discretion to limit a criminal defendant's presentation of evidence and cross-examination of witnesses. *See Alford v. United States,* 282 U.S. 687 (1931) ("The extent of cross-examination [of a witness] with respect to an appropriate subject of inquiry is within the sound discretion of the trial court."); *United States v. Whitmore*, 359 F.3d 609, 615-16 (D.C. Cir. 2004) ("The district court . . . has considerable discretion to place reasonable limits on a criminal defendant's presentation of evidence and cross-examination of government witnesses."). The court may also prohibit cross-examination that goes beyond matters testified to on direct examination. Fed. R. Evid. 611(b). This is particularly so when the information at issue is of a sensitive nature. *See e.g., United States v. Balistreri,* 779 F.2d 1191, 1216-17 (7th Cir. 1985) (upholding district court's decision to prohibit cross-examination of agent about sensitive information about which that agent did not testify on direct examination and which did not pertain to the charges in the case), *overruled on other grounds* by *Fowler v. Butts,* 829 F.3d 788 (7th Cir. 2016). Other permissible reasons for limiting cross-examination include preventing harassment, prejudice, confusion of the issues, or repetitive, cumulative, or marginally relevant questioning. *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986).

While limiting the defendant's opportunity for cross-examination may implicate the constitutional right to confront witnesses, the Confrontation Clause only guarantees "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Even evidence that may be relevant to an affirmative defense should be excluded until a

defendant sufficiently establishes that defense through affirmative evidence presented during his or her own case-in-chief.  *See United States v. Lin,* 101 F.3d 760, 768 (D.C. Cir. 1996) (acknowledging trial court has discretion to limit cross-examination on prejudicial matters without reasonable grounding in fact); *United States v. Sampol,* 636 F.2d 621, 663-64 (D.C. Cir. 1980) (holding that trial court properly limited cross-examination of alleged CIA murder scheme until defense put forth sufficient evidence of the affirmative defense in its case-in-chief); *United States v. Stamp,* 458 F.2d 759, 773 (D.C. Cir. 1971) (finding trial court properly excluded cross examination of government's witness with response to matter only related to an affirmative defense and not elicited through direct exam).  Preventing the defendant from exploring the topics above will not infringe his Confrontation Clause right because, as shortly explained, such topics have little probative value, and the defendant has more direct ways of making his case.

## IV. ARGUMENT

### A. This Court Should Preclude The Defendant From Seeking Testimony On The Location of Specific Surveillance Cameras

The United States asks the Court to restrict the defendant's presentation of evidence regarding the specific position of U.S. Capitol Police surveillance cameras.  To meet its burden of proof at trial, the government will present video evidence from a variety of sources, including Capitol Police surveillance footage.  The Capitol Police maintains an extensive closed-circuit video system which includes cameras inside the Capitol Building, inside other buildings within the Capitol complex, and outside on Capitol grounds.  These cameras captured thousands of hours of footage from the breach of the Capitol and have been instrumental in documenting the events of January 6, 2021.

However, the U.S. Capitol Police's surveillance system also serves an important, and ongoing, function in protecting Congress and, by extension, national security.  In particular, the

footage from the system is subject to limitations and controls on access and dissemination. To find relevant footage from the Capitol Police's surveillance system and adequately prepare for trial, one would need to use maps which display the locations of the interior and exterior cameras. The government has therefore provided the defense with maps that display these locations.

Due to the sensitive nature of these items, the government seeks an order limiting the defense from probing, during cross-examination, the exact locations of Capitol Police surveillance cameras or from using the maps, which show each camera's physical location, as an exhibit at trial.[1] The defendant does not oppose this motion and has indicated that he does not intent to elicit any such testimony.

### B. This Court Should Preclude Testimony On Specific Secret Service Tactics And Emergency Operations

The United States asks the Court to limit the defendant's cross examination of any witness regarding the Secret Service's specific tactics and emergency operations. The government intends to elicit testimony from a United States Secret Service agent that at the time of the Capitol breach, Secret Service agents were on duty to protect Vice President Mike Pence and his two immediate family members, all of whom were present at the Capitol.

The government seeks an order limiting the cross examination of any witness regarding the functions performed by the Secret Service. Not only would such testimony be irrelevant, but the very nature of the Secret Service's role in protecting the Vice President and his family implicates sensitive information related to that agency's ability to protect high-ranking members of the Executive branch and, by extension, national security. Thus, the government seeks an order

---

[1] These maps have been disclosed to the defendant but, pursuant to the terms of the protective order, have been designated Highly Sensitive. Moreover, these maps have been designated as "Security Information" under 2 U.S.C. §1979 which forbids their use without the approval of the Capitol Police Board.

5

limiting the cross-examination of any witness regarding the role of the Secret Service on January 6. The defendant does not oppose this motion and has indicated that he does not intent to elicit any such testimony.

      **C.    This Court Should Preclude the Defendant From Arguing Entrapment By Estoppel Or Making A Public Authority Defense**

The United States asks the Court to prohibit the defendant from making arguments or introducing irrelevant evidence that former President Trump or other officials gave the defendant permission to attack the U.S. Capitol, in what are commonly known as "entrapment-by-estoppel" or "public authority" defenses. Nevertheless, because some of the defendant's proffered exhibits suggest he may make similar arguments at trial, the government requests that the Court ensure those arguments do not cross the line into impermissible territory that would serve only to confuse the jury or encourage improper nullification.[2] The defendant has indicated that he does not intend to raise a formal defense of public authority under Rule 12.3, but he opposes this motion.

As courts in this District have explained, the entrapment-by-estoppel and public authority defenses are closely related and derive from a constitutional prohibition against "convicting a citizen for exercising a privilege which the State had clearly told him was available to him." *United States v. Sheppard*, No. 21-cr-203, 2022 WL 17978837, at *7 (D.D.C. Dec. 28, 2022) (J. Bates) (quoting *Cox v. Louisiana*, 379 U.S. 559, 571 (1965)). Both defenses are narrow ones, however, and a defendant may succeed on them only if he meets rigorous evidentiary requirements. *See United States v. Alvarado*, 808 F.3d 474, 484-85 (11th Cir. 2015) ("The public authority defense

---

[2] The defense may not encourage jury nullification. As the DC Circuit has made clear:
>  A jury has no more "right" to find a "guilty" defendant "not guilty" than it has to find a "not guilty" defendant "guilty," and the fact that the former cannot be corrected by a court, while the latter can be, does not create a right out of the power to misapply the law. Such verdicts are lawless, a denial of due process and constitute an exercise of erroneously seized power.

*United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983).

is narrowly defined, however, and a defendant will not be allowed to assert the defense, or to demand that the jury be instructed on it, unless he meets certain evidentiary prerequisites."); *United States v. Baker*, 438 F.3d 749, 755 (7th Cir. 2006) ("The [entrapment-by-estoppel] defense is a narrow one."). In particular, to succeed on an entrapment-by-estoppel claim, a defendant must prove:

> (1) that a government agent actively misled him about the state of the law defining the offense; (2) that the government agent was responsible for interpreting, administering, or enforcing the law defining the offense; (3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and (4) that the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation.

*United States v. Chrestman*, 525 F. Supp. 3d 14, 31 (D.D.C. 2021) (C.J. Howell) (quoting *Cox*, 906 F.3d at 1191). This district has articulated a similar four-part analysis for the public authority defense:

> [A]n individual (1) reasonably, on the basis of an objective standard, (2) relies on a (3) conclusion or statement of law (4) issued by an official charged with interpretation, administration, and/or enforcement responsibilities in the relevant legal field.

*Sheppard*, 2022 WL 17978837 at *8 (quoting *United States v. Barker*, 546 F.2d 940, 955 (D.C. Cir. 1976). Common between these standards is, among other things, that a government official must offer a "state" or "statement" of the law.

In urging his supporters towards the Capitol, then-President Trump made no "statement" of law. By now, several courts in this District have considered various defendants' arguments that the President's words immunized their actions on January 6. To the government's knowledge, all these arguments have failed. *See Sheppard*, 2022 WL 17978837 at *9 (prohibiting defendant from seeking discovery or presenting evidence at trial on entrapment-by-estoppel or public authority defenses); Order at 2, ECF No. 39, *United States v. Thompson*, No. 21-cr-161 (D.D.C. Mar. 23, 2022) (J. Walton) (excluding evidence of former President Trump's statements for all purposes as

unduly prejudicial under Fed. R. Evid. 403); *United States v. Grider*, No. 21-cr-022, 2022 WL 3030974, at *4 (D.D.C. Aug. 1, 2022) (J. Kollar-Kotelly) (declining to instruct jury on defense of entrapment by estoppel); *Chrestman*, 525 F.Supp.3d at 33 (noting that an entrapment-by-estoppel defense is "highly unlikely" to succeed and declining to consider it as weighing in favor of granting pre-trial release).

Defendants' efforts to assert an entrapment-by-estoppel defense have uniformly failed, given that, as Judge Bates observed, the defense is available "only when the official's statements or conduct state or clearly imply that the defendant's actions are lawful." *Sheppard*, 2022 WL 17978837 at *9. The key problem with this defense is that, as Judge Bates has observed, "President Trump neither stated nor implied that entering the restricted area of the Capitol grounds and the Capitol building or impeding the certification of the electoral vote was lawful." *Id.* Rather:

> [Trump's] speech simply suggests that it would be an act of "boldness" to "stop the steal." Thus, allowing [the defendant's] reliance on these words would be an instance of allowing "following orders, without more, [to] transform an illegal act into a legal one"—something the D.C. Circuit has unequivocally declined to do.

*Id.* (quoting *United States v. North*, 910 F.2d 843, 879 (D.C. Cir. 1990) (per curiam), *opinion withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990)).

Similarly, Judge Kollar-Kotelly, in considering an entrapment-by-estoppel argument, noted that "former President Trump's statements did not in any way address the legality of the actions he urged his supporters to take. He did not, for example, assure them that marching along Pennsylvania was 'lawful' or that occupying Capitol grounds was 'permissible.'" *Grider*, 2022 WL 3030974 at *3. In short, then-President Trump did not "actively misle[a]d [the defendant] about the state of the law," because Trump did not make any statement about the law at all. *Id.* at 2 (quoting *Chrestman*, 525 F.Supp.3d at 14).

Yet, even if then-President Trump had made a statement about the law, allowing those

8

statements to immunize the defendant's conduct would raise serious constitutional concerns. As Judge Howell observed about another entrapment-by-estoppel defense by a similarly situated defendant, "No American President holds the power to sanction unlawful actions because this would make a farce of the rule of law." *Chrestman*, 525 F.Supp.3d at 32:

> [N]o President may unilaterally abrogate criminal laws duly enacted by Congress as they apply to a subgroup of his most vehement supporters. Accepting that premise, even for the limited purpose of immunizing defendant and others similarly situated from criminal liability, would require this Court to accept that the President may prospectively shield whomever he pleases from prosecution simply by advising them that their conduct is lawful, in dereliction of his constitutional obligation to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. That proposition is beyond the constitutional pale, and thus beyond the lawful powers of the President.
>
> Even more troubling than the implication that the President can waive statutory law is the suggestion that the President can sanction conduct that strikes at the very heart of the Constitution and thus immunize from criminal liability those who seek to destabilize or even topple the constitutional order. In addition to his obligation to faithfully execute the laws of the United States, including the Constitution, the President takes an oath to "preserve, protect and defend the Constitution." U.S. Const. art. II, § 1, cl. 8. He cannot, in keeping with his constitutional function and his responsibilities under Article II, lawfully permit actions that directly undermine the Constitution.

*Id.* at 32–33 (D.D.C. 2021). In other words, to allow an entrapment-by-estoppel or public authority defense based on the President's false statements of law would implicate both the Take Care clause and the presidential oath of office, and more fundamentally question the nature of the rule of law in America.

Although *Chrestman* involved an argument that former President Trump gave the defendants permission to enter the Capitol grounds, the reasoning in *Chrestman* applies equally to any argument that other officials or law enforcement officers gave permission to the defendant to do the same. Just as a President cannot unilaterally repeal laws, no other officials or members of law enforcement could use their authority to allow individuals to enter the Capitol building during a violent riot. As Judge Howell observed, "the logic in *Chrestman* that a U.S. President

cannot unilaterally abrogate statutory law applies with equal force to government actors in less powerful offices, such as law enforcement officers protecting the U.S. Capitol Building." Memorandum and Order, *United States v. Williams*, No. 21-cr-377, at *2 (D.D.C. June 8, 2022).

Even if Sparks could establish that an official or officer told him that it was lawful to enter the Capitol building or allowed him to do so, his reliance on any such statement would not be reasonable considering the "obvious police barricades, police lines, and police orders restricting entry at the Capitol." *Chrestman*, 525 F.Supp.3d at 32. Moreover, Sparks' actions contradict any argument that he relied on any such statement by law enforcement when he decided to unlawfully enter the Capitol grounds and jump through a window he had just watched other rioters smash open—something that Trump's speech never even arguably called for from the crowd. Thus, the defendant should be prohibited from arguing that his conduct was lawful because someone allegedly told him it was.

Finally, "entrapment by estoppel is a defense rather than an evidentiary objection and, accordingly, should have been raised prior to trial." *United States v. Colon Ledee*, 967 F. Supp. 2d 516, 520 (D.P.R. 2013). This Court and many other courts in this district have granted similar motions in January 6 cases in particular. *See United States v. Horn*, 21-cr-301 (TJK) (ECF 76, at 2) (denying similar unopposed motion). For all these reasons, and because Sparks has disclaimed raising this defense thus far, and for the reasons discussed above, the defendant should be precluded from raising these defenses at trial.

**D. This Court Should Preclude The Defendant From Improper Arguments About Alleged Inaction By Law Enforcement Officers**

**1. The Defendant Cannot Argue that Alleged Police Inaction Made His Conduct On January 6, 2021 Legal**

In addition to prohibiting arguments that any officials or officers permitted the defendant to enter the Capitol grounds, the Court should bar the defendant from arguing that any failure of

law enforcement to act rendered the defendant's conduct legal. The same reasoning that applied in *Chrestman* again applies here. That is, like the President, a law enforcement officer cannot "unilaterally abrogate criminal laws duly enacted by Congress" through his or her purported inaction. *Chrestman*, 525 F.Supp.3d at 33. An officer cannot shield an individual from liability for an illegal act by failing to enforce the law, nor can an officer ratify unlawful conduct by failing to prevent it.

"Settled caselaw makes clear that law officer inaction—whatever the reason for the inaction—cannot sanction unlawful conduct." *Williams*, No. 21-cr-377 at *3; s*ee also Garcia v. Does*, 779 F.3d 84, 95 (2d Cir. 2015) (en banc) (entrapment-by-estoppel defense rejected after defendants argued that their prosecuted conduct had been implicitly approved by the police but could not show that it was "affirmatively authorized" by the police). The same principles apply here. The defendant should be prohibited from arguing that his conduct was lawful because law enforcement officers allegedly failed to prevent it or censure it when it occurred.

The defendant opposes this motion.

### 2. The Defendant Cannot Rely on Evidence of Law Enforcement Inaction Without a Proper Foundation

Similarly, Sparks may claim that he lacked the requisite intent to commit the crimes charged, and in support of this defense, he may seek to point out alleged inaction by the police to stop rioters' progress into and through the Capitol building. This evidence or argument is only proper if it is supported by a proper foundation.

The conduct of law enforcement officers may be relevant to Sparks's state of mind on January 6, 2021. However, unless the defendant shows that he specifically observed or was otherwise aware of some alleged inaction or invitation by law enforcement, such evidence is irrelevant because it could not have impacted his intent. Federal Rule of Evidence 401 states that

evidence is relevant if it "has any tendency to make a fact more or less probable…and the fact is of consequence in determining the action." Fed. R. Evid. 401. If the defendant was not aware of law enforcement's alleged inaction or alleged invitations to enter at the time he entered or remained on restricted grounds or in the Capitol building, any such alleged inaction or behavior would have no bearing on his state of mind and therefore would not meet the threshold for relevance. For example, evidence that a law enforcement officer across the building outside of Sparks's view may have waved rioters inside, or offered them aid or comfort, is simply irrelevant in this case. Consequently, unless the defendant shows he specifically observed or was aware of alleged inaction or invitations by the police, this Court should exclude such testimony, evidence, and argument.

The defendant opposes this motion.

### E. This Court Should Preclude The Defendant From Arguing That His Conduct Was Protected By The First Amendment

The Court should preclude the defendant from arguing or eliciting evidence that there was a First Amendment right to protest inside the restricted area around the Capitol on January 6.

The government will show that the Capitol grounds were restricted on January 6 within the meaning of 18 U.S.C. § 1752(c)(1)(B) (defining a "restricted building or grounds" as "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting"). The government can—and on January 6, did—restrict an area that is a traditional public forum for legitimate government ends. This district has affirmed that the government may close a public forum in similar circumstances. *See Mahoney v. United States Marshals Service*, 454 F. Supp. 2d 21, 32-33 (D.D.C. 2006) (U.S. Marshals Service did not violate the First Amendment by restricting access to a sidewalk in front of St. Matthew's Cathedral for Red Mass, even though the sidewalk was a

traditional public forum). Unsurprisingly, other courts have similarly upheld temporary closures of traditional public forums for safety reasons. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1129-30 (9th Cir. 2005) (finding that an emergency order closing a core area of downtown Seattle to protests during World Trade Organization conference was constitutional in part because its purpose was to maintain and restore civic order); *Marcavage v. City of New York*, 489 F.3d 98, 105 (2d Cir. 2012) ("[T]here can be no doubting the substantial government interest in the maintenance of security at political conventions"); *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1222 (10th Cir. 2007) ("In this case, there can be no doubt that the City's interest in providing security to a gathering of defense officials is of the highest order"); *Bl(a)ck Tea Society v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004) (upholding a street-closure plan around the Democratic National Convention that made it nearly impossible for groups wishing to demonstrate to do so within sight and sound of the delegates).

On January 6, 2021, the United States Capitol Police and the United States Secret Service coordinated to establish a restricted perimeter around the Capitol building that encompassed a portion of the Capitol grounds. No member of the public, including the defendant, had a First Amendment right to engage in protest or speech within that restricted area. The Court should preclude the defendant from eliciting testimony to the contrary and stop counsel from arguing that the defendant was engaged in protected speech or pursuing his "right" to protest when he was on the Capitol grounds.

The defendant opposes this motion.

**CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court grant its motion *in limine* to preclude improper defense arguments and evidence.

                                            Respectfully submitted,

                                            MATTHEW M. GRAVES
                                            United States Attorney
                                            D.C. Bar No. 481052

By:    /s/ *Emily W. Allen*
           EMILY W. ALLEN, Cal. Bar No. 234961
           SONIA MITTAL, Il. Bar No. 6314706
           Assistant United States Attorneys
           601 D Street NW
           Washington, DC 20530
           emily.allen@usdoj.gov
           (907) 271-4724