UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 21-CR-87 (TJK) |
| | : | |
| MICHAEL SPARKS, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE**

Defendant Michael Sparks asks the Court to prohibit the United States from introducing several categories of relevant and probative evidence, all of which will help establish important aspects of Sparks's knowledge and intent on January 6, 2021. ECF 87 (Def. Motion). Sparks's intentions on January 6 will likely be the primary if not the sole disputed fact at trial. Evidence that shows his planning and preparations for the event is unquestionably important for the jury to assess his knowledge and state of mind. Accordingly, for the reasons described here, Sparks's Motion in Limine must be denied.

**FACTUAL BACKGROUND**

Sparks began railing against the 2020 Presidential election results on social media as early as election day itself. On November 3, 2020, he posted to Facebook, "Nyi nyi [not yet implemented] and he's going to be your president 4 more years." Ex. 304. He repeatedly posted that Trump "will win" and "is going to be your president." *Id.* On November 5, 2020, Sparks posted photos of election workers handling mail-in ballots, and asked his Facebook followers how it was possible that "they found 300 k votes" all for Biden, "[n]ot even one person was for trump ." Ex. 306. As early as November 6, 2020, he began talking about violence to ensure his preferred political outcome. He posted, "we're going to cry and burn down cities" and the next day asked, "Wouldn't it be something if 70 million came to arms[.]" Ex. 307, 308. He framed it as a holy

"battle against evil" that would "get real ugly real quick." Ex. 312.

Around December 12, 2020, Sparks and his friend Joseph Howe traveled to Washington, D.C. together for what Sparks described as "a great weekend…supporting what we believe in. TRUMP 2020 he's coming in strong[.]" Ex. 320. Howe booked their hotel in DC. Ex. 712. They watched Mike Lindell give a speech about election fraud and mishandling of voting machines. Ex. 411. Sparks shared a number of photos from the weekend, including pictures of him and Howe on the National Mall and a crowd of rally-goers. *Id.* About the rally, he boasted, "We[] we're [sic] there live also it was awesome[.]" Ex. 318.

By mid-December, Sparks's preparations for violence only intensified. He predicted something "biblical" and warned his Facebook friends to "be ready to defend your country and your family" because "freedom never has been free[.]" Ex. 321. He wanted to "[d]rag these clowns out of office" and, on December 24, 2020, he sent a warning to lawmakers in Washington that "we the people" would drag them out of office "by your face":



Ex. 325.

2

Sparks and Howe coordinated another trip to D.C. for the certification proceedings on January 6. On December 26, 2020, Howe created a fundraising website asking "other Patriots" to contribute to the costs of Howe "and a few other Patriots" traveling to Washington. Ex. 701. On January 1, 2021, Sparks posted a photo of a self-proclaimed Black Panther and BLM activist, with an article link; Sparks added the comment, "Meet us at dc and we will just work it all out in one day[.]" Ex. 329. Also on January 1, 2021, from his Parler account at 7:00 pm, Sparks declared, "Yes we want a civil war to be clear[.]" Ex. 383. At 8:30 pm, from Facebook, he shared a meme: "Señor Trump will not believing the White House in 2021." Ex. 331 ("believing" as a play on "be leaving").

The next day, January 2 at 2:04 pm, Sparks shared a Western Journal article describing how Trump could use the certification proceedings scheduled for January 6 to find a "Path to Victory." Ex. 332. Four minutes later, he commented on Facebook, "The votes were stolen . You will have time to fight for what you believe in . As for me I believe in the constitution so I'll die fir it . Trump is my president." Ex. 333. Just two hours after that, at 4:28 pm on January 2, 2021, Sparks went to the Kentucky Gun Company in Bardstown, Kentucky where he bought a 22-caliber heavy barreled semiautomatic rifle and a scope. Ex. 605, 606.

The next day, January 3, 2021, Sparks took to Facebook to help raise money for his trip to D.C., referring his friends to Howe's fundraising site. Ex. 334. That evening, Sparks made his intentions for the trip plain: "It's time to drag them out of Congress . It's tyranny[.]" Ex. 335. On January 4, 2021, a friend asked Sparks if he was going to see Trump. Sparks replied, "We're going to drag congress out by there face if need be . We are in tyranny. So yes daddy going[.]" Ex. 414.

On January 6, 2021, Sparks, Howe, and some of their friends (the "few other Patriots" Howe had referenced in his fundraising pitch) went to the rally on the National Mall near where Trump would be speaking. Ex. 415 (text messages), 416 (photo), 417 (photo). Sparks and Howe

3

each wore protective gear that day. One of the friends who attended the rally with Sparks and Howe confirmed to the FBI that both men wore tactical vests on January 6.[1] Sparks wore a bulky, rigid, vest underneath his outer jacket; his body armor can be seen under his jacket in video footage throughout the day.

 

Ex. 263 (left, walking on National Mall), 219 (right, at Senate Wing Door window).

Howe also wore body armor under his outer jacket, and he carried goggles and a respirator mask which he put on as he and Sparks approached the Capitol. Howe's tactical vest could be seen when he took off his jacket inside the Capitol building later that day.

---

[1] This witness is not expected to testify at trial, but the statement underscores that evidence of Sparks wearing body armor is not speculative, and the government has a good faith basis to present the evidence and argue the appropriate inferences to the jury.

4

 

Ex. 210 (left, Sparks and Howe (wearing goggles, respirator mask, and body armor) at landing of Northwest Stairs), 266 (right, Howe inside Capitol with body armor exposed after removing his outer jacket). In October 2022, the FBI recovered Howe's tactical vest in a search of his Kentucky residence. Ex. 721 (vest), 722 (photo of vest recovered at Howe residence).

After they left the rally, Sparks and Howe walked down the National Mall toward the Capitol building together. They were together when an interviewer filmed them talking about their plans. Howe insisted, "we're getting in that building." A man off-camera whose voice sounds very much like Sparks[2] agreed, "all it takes is one person to go, the rest is following." Ex. 263.

As the events of January 6 unfolded before the world, Sparks's involvement was prominent, and he quickly made the news. Sparks's friends warned him that he was wanted by the police. Ex. 414. Sparks was proud of what he had done. When his mom told him he "had no business in that building[,]" Sparks replied, "I'll go again given the opportunity[.]" Ex. 415. And he falsely reported that the media had "staged" some of the footage. Ex. 421; *see also* Ex. 337

---

[2] Sparks, through counsel, has disputed that this was him speaking. Based on other examples of Sparks's voice where he speaks consistent with the voice of this speaker, and Sparks's proximity to the interviewer and Howe at that time, this is an issue for the trier of fact to decide.

5

(claiming "Capitol police literally let the protestors into the building"). In a Facebook message on January 7, 2021, Sparks warned, "A new dawn is coming. Be ready. Just pray and trust in the Lord." Ex. 336. Two days later, on January 9, he claimed he was canceling his Facebook account and had "give[n] up on democracy." Ex. 338. He warned readers to "be ready for a lot of big events. Have radios for power loss etc. Love every body[.]" *Id.*

The same day Sparks proclaimed he "g[a]ve up on democracy[,]" January 9, 2021, he contacted Woods Armory in Kentucky to ask about a firearm for sale. Ex. 608. On January 10, 2021, at 1:06 pm, he went to the Woods Armory store and bought a Taurus 605 Magnum revolver. Ex. 609, 610. He also continued railing against the election results and advocating for violence. On January 11, 2021, he warned a friend on Facebook, "If we let this fraud go we lose democracy[.] And our freedom[.]" Ex. 340. On January 14, 2021, he messaged a friend, referring to Joe Biden, "That clown is going in front of a shooting squad[.]" As late as January 17, 2021, Sparks posted to Facebook, "Trump will be in 4 more years. It's going to get ugly but it has to happen[.]"

The FBI obtained Sparks's cell phone on January 24, 2021, and Sparks consented to a search. Ex. 401. When the FBI accessed Sparks's data, they discovered that the messages Sparks and Howe had exchanged between December 2020 and January 2021 were all deleted. The FBI recovered the date and time of more than 30 messages from Howe to Sparks, but the content of those messages was gone. Ex. 427. More than a year and a half later, in October 2022, the FBI obtained Howe's cell phone. Ex. 711. They did not recover the December 2020 and January 2021 messages that had been deleted from Sparks's phone, but the FBI did locate more recent texts between Sparks and Howe. On November 17, 2021, many months after his arrest in this case, Sparks referenced the stolen election. Ex. 713. Again on January 9, 2022, after Howe said he thought something big was brewing, Sparks said "I truly believe they are going to expose the fraudulent election." *Id.* Still railing against the 2020 election results in early 2022, a year after

6

he was charged in this case, Sparks said there was "a whole lot of talk about decertification of Arizona and Georgia and a Wisconsin[.]" *Id.* Sparks was continuing to discuss his views on the 2020 election into mid-2022 shortly before Howe's phone was seized.

## **LEGAL PRINCIPLES**

Under Federal Rule of Evidence 401, evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Relevant evidence is admissible under Rule 403 unless its probative value is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403. The Rule 403 balancing test focuses on "unfair prejudice," or prejudice that is "compelling or unique," *United States v. Mitchell*, 49 F.3d 769, 777 (D.C. Cir. 1995) (quoting *United States v. Washington*, 969 F.2d 1073, 1081 (D.C. Cir. 1992)), or has "an undue tendency to suggest decision on an improper basis," *United States v. Ring*, 706 F.3d 460, 472 (D.C. Cir. 2013) (quoting Fed. R. Evid. 403, Advisory Committee Notes, 1972 Proposed Rules). "Unfair prejudice as used in Rule 403 is not to be equated with [evidence] simply adverse to the opposing party. Virtually all evidence is prejudicial or it isn't material. The prejudice must be unfair." *United States v. Cassell*, 292 F.3d 788, 796 (D.C. Cir. 2002) (quoting *Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977) (alterations omitted)).

Rule 403 "'tilts, as do the rules as a whole, toward the admission of evidence in close cases.'" *Id.* at 795 (quoting *United States v. Moore*, 732 F.2d 983, 989 (D.C. Cir. 1984)). The balance "should generally be struck in favor of admission when the evidence indicates a close relationship to the event charged[.]" *Id.* (quotation marks and citation omitted).

To the extent that there may be any concern that the jury could use contested evidence for an improper purpose, the remedy is not to exclude highly relevant evidence but to mitigate this concern with a limiting instruction to the jury. *See, e.g.*, *United States v. Moore*, 651 F.3d 30, 96

7

(D.C. Cir. 2011) (finding that limiting instructions to a jury can cure any risk of prejudice).

## ARGUMENT

**I.    Sparks's Firearms Purchases Demonstrate his Intent**

Sparks purchased a semiautomatic rifle on January 2, 2021, less than a day after he advocated "civil war" and just two hours after declaring that he was willing to fight and die for his political cause, specifically referencing "stolen" votes. This act—a fact that the jury must weigh in context with Sparks's contemporaneous statements—is important evidence of Sparks's corrupt intent to obstruct the certification of the Electoral College vote on January 6. Indeed, he bought the weapon two hours after circulating an article outlining exactly how his political allies could prevent the certification from moving forward in the manner Congress intended.

Evidence that Sparks purchased the rifle, days before his trip to DC and in the midst of his planning for the events of January 6, is highly probative to his "corrupt" intent and "consciousness of wrongdoing"—an essential element of Count One charging obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2). It is also highly probative of his intent to obstruct law enforcement officers during a civil disorder—an essential element of Count Two charging a violation of 18 U.S.C. § 231(a)(3). Sparks's words in his Facebook posts, Parler discussions, and text messages are all probative of his intent. But his actions on January 2, putting his money where his mouth had been for weeks, provides significant additional evidence of the intent behind his actions on January 6. The jury may well find that this action speaks as loudly as Sparks's words, and brings more life to his claim that he was prepared to die for his belief in the Constitution. It was just the very next night that he circulated Howe's fundraising platform and added, "It's time to drag them out of Congress[.]" Ex. 335; *see also* Ex. 414 (similar comments on January 4, 2021).

Sparks's purchase of a revolver on January 10 is also probative of his intent. His statements demonstrate that his motives and desires did not change following the events of January 6. He

was unrepentant, proclaiming that he would "go again if given the opportunity," and spreading false information that the police had let rioters into the building (despite that Sparks was the first person to enter and was met by a police officer who attempted in vain to stop his advance). Even after January 6, Sparks continued to advocate for violence to prevent Biden from taking office, predicting, just days after his second firearms purchase, that Biden would be facing a firing squad. Although Sparks's second firearm purchase was after January 6, it is therefore still highly probative of his intent and state of mind just four days earlier.

Sparks's intent on January 6 is central to the government's case. Proving his intent will necessarily require that the jury weigh indirect evidence to determine the inner workings of Sparks's mind. As the D.C. Circuit has noted, where the defendant's state of mind is the question, "it may be near impossible to establish the requisite *mens rea* through direct evidence. In the absence of any specific statement or other contemporaneous documentation of the defendant's subjective motivation, the trier of fact can do no more than ascribe an intent on the basis of the circumstances surrounding the defendant's actions." *United States v. Schaffer*, 183 F.3d 833, 843 (D.C. Cir. 1999). For this reason, the jury must be permitted to assess a defendant's actions and all the circumstances surrounding those actions. *Id.* The D.C. Circuit has also recognized that the timing need not be determinative; that is, "indirect evidence [of the defendant's state of mind] might include a defendant's conduct before, during, or after the charged criminal acts, or the facts and circumstances known to him when he acted." *United States v. Torres*, 894 F.3d 305, 311 (D.C. Cir. 2018) (citing *United States v. Hurt*, 527 F.3d 1347, 1351 (D.C. Cir. 2008)).

Under Rule 401, then, Sparks's purchase of firearms, in the context of all the surrounding circumstances on both January 2 and January 10, are clearly relevant to Sparks's state of mind on January 6. And this is true even though no evidence suggests Sparks took the rifle he purchased on January 2 to the Capitol on January 6. His purchase—in the wake of his explicit desire for

9

"civil war" and his declaration that he would die for his views on the Constitution and tyranny, just hours after he circulated information about the proceedings in Congress on January 6 and solidified his travel plans—is clearly relevant on its own, without any need to show that he had a weapon with him on January 6. And likewise, his January 10 purchase was clearly tethered to his ongoing calls for political violence in the aftermath of January 6. Sparks was preparing himself for ongoing political violence when he "g[a]ve up on democracy" and armed himself on January 10.

That Sparks's purchases were themselves lawful does not lessen the probative value of the evidence. This is no different than, for example, the perfectly proper and routine practice of using someone's First Amendment-protected speech to illustrate intent and state of mind. *See*, *e.g.*, *Wisconsin v. Mitchell*, 508 U.S. 508 U.S. 476, 489 (1993) (First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent"); *United States v. Ring*, 706 F.3d 460, 472 (D.C. Cir. 2013) (rejecting the argument that "permitting a jury to draw adverse inferences from constitutionally protected activity violates a defendant's First Amendment rights"); *United States v. Warnagiris*, No. CR 21-0382 (PLF), 2023 WL 6973213, at *5 (D.D.C. Oct. 23, 2023) (applying same principle in January 6 prosecution). Both rights – the right to free speech and the right to bear arms – are protected, in one form or another, by the Constitution, but such evidence may nonetheless be used in the context of a criminal prosecution to prove an element of a crime.

The evidence is not unfairly prejudicial under Rule 403. The government will not suggest that the purchases themselves were unlawful, will not insinuate that Sparks in fact used the firearms, and will not claim that Sparks had the rifle with him at the Capitol on January 6. To the extent Sparks has concerns that the jury might be confused or misled, a limiting instruction clarifying these points – an instruction this Court has previously and properly embraced – would

cure any risk that the jury could use these facts for any improper purpose. *See United States v. Jensen*, 21-cr-6 (TJK), ECF 93 (overruling 403 objection to admit evidence of January 6 defendant's associates' plan to travel to Washington D.C. with firearms, despite no evidence that the defendant was armed while in D.C., with an appropriate limiting instruction).

Sparks argues that this evidence should be excluded under Rule 404 because, he claims, it "would constitute impermissible character evidence[.]" Def. Motion at 2. That is not the case. The evidence of Sparks's lawful purchases four days before and four days after January 6 will be used to demonstrate his state of mind on the day of the charged offenses, not to prove anything to do with Sparks's character. Rule 404 is simply inapplicable.

Finally, should the Court exclude evidence of either purchase from the government's case-in-chief, the United States respectfully requests that the Court permit the use of this evidence to rebut any evidence or argument presented by the defense that opens the door to this highly relevant evidence that bears on Sparks's state of mind.

## II. Evidence of Sparks's and Howe's Decision to Wear Body Armor to Storm the U.S. Capitol is Highly Probative

Sparks and Howe planned their trip to Washington D.C. together, on the heels of their "great weekend" in DC in December 2020. As they planned for January 6, they were prepared for violence. This is demonstrated not only by Sparks's words (through his Facebook posts, Parler discussions, and text messages), but also in his actions that day. The fact that Sparks and his companion both packed and donned protective gear demonstrates that they were prepared for the riot that came to pass. The fact that Sparks and Howe were both wearing body armor and other forms of protection is highly probative of Sparks's state of mind on January 6 itself.

### A. Sparks's Decision to Wear Body Armor to the Capitol Will be Established Through Video Evidence and Percipient Witnesses

That Sparks was wearing body armor on January 6 can be seen in videos taken that day.

11

As shown above, the body armor under his jacket was visible as he walked from the Ellipse to the Capitol, even as he covered his outer jacket with a large backpack. And his body armor was even more visible in close-up footage taken after he removed his backpack, as he prepared to enter and then climbed inside the broken window next to the Senate Wing Door. Circumstantially, it is also relevant that Sparks's travel companion, who he planned his trip with and who had joined Sparks in Washington D.C. for a rally just a couple of weeks before, and who Sparks could observe throughout the day on January 6, was also wearing body armor. Contrary to Sparks's argument, Def. Motion at 3, the fact that Howe wore body armor is circumstantial evidence the jury can consider, along with all the other evidence, to determine whether Sparks was also wearing a protective vest that day.

At trial, such facts will be proven through video evidence, percipient witnesses, and testimony from law enforcement officers about how a protective vest looks and fits underneath an outer layer of clothing. That is not a matter of opinion, but instead a set of observations or objective evidence of what the defendant was wearing. Even if a government witness's observations about Sparks's clothing could be seen as opinion, it is "not based on scientific, technical, or other specialized knowledge" and therefore not prohibited by Federal Rule of Evidence 701. In short, "[i]t is not clear that such testimony presents an opinion at all and, even if it did, no specialized knowledge beyond the ken of a lay witness is necessary" to reach that opinion. *United States v. Robinson*, 16-cr-98 (CKK), 2017 WL 11496730, at *1 (D.D.C. June 30, 2017).

Sparks's other objections are meritless. There is nothing unfairly prejudicial about presenting evidence of what the defendant wore as he committed the charged crimes, just as there could be nothing unfairly prejudicial about, for example, evidence that a defendant wore goggles or a gas mask. Rule 403 therefore cannot block this evidence. Moreover, testimony about the clothing and equipment Sparks wore during the charged offenses has nothing to do with his

12

character, so Rule 404 is inapplicable. Finally, Rule 704's prohibition on expert opinion about the defendant's mental state is simply not in play. While evidence that Sparks wore body armor will help the jury to determine whether he acted knowingly, intentionally, and corruptly in his efforts to stop the certification and disrupt the proceedings in Congress, no one but the jury will be asked to draw that conclusion.

### B. Evidence of Sparks's Observations of Howe is Highly Relevant to Sparks's Knowledge and Intent

Like Sparks, Howe prepared for violence and packed for January 6 accordingly. He carried a backpack and kept on hand a pair of protective goggles and a respirator mask. He wore a protective vest under his outer jacket, which, when he was inside the Capitol building, he removed, making his vest his outermost layer of clothing. When the FBI searched his home in October 2022, they located the body armor in his backyard, affixed to a post in an outdoor shooting range on Howe's property. (The FBI did not recover Howe's respirator mask or the googles he wore on January 6.) The government intends to introduce the vest that was recovered from Howe's home (Ex. 721), and a photograph of the location where the vest was found (Ex. 722).[3]

Evidence of Howe's planning and preparation for the events of January 6, and the clothing and equipment he wore that day, is probative of Sparks's knowledge and intent because Sparks traveled side-by-side with Howe from their morning at the Ellipse, across the National Mall, through the battleground of the West Plaza and Northwest Stairs, right up to the door of the Capitol itself. Sparks's awareness of his companion's and co-defendant's planning and preparation is

---

[3] This photograph was taken by the FBI during the search of Howe's home; it was not found on Howe's phone as the defendant's motion states. Def. Motion at 5. That difference may be immaterial, but the photograph is relevant evidence. The government intends to introduce the photograph in addition to the vest to explain the condition the vest is currently in. The vest in its current state appears to have been chewed or decomposed, and the fact that it was found outdoors helps explain why in certain respects it looks different from how it looked on January 6, 2021.

13

probative of his own planning for the events, and of his knowledge that people in the crowd, like Howe, were approaching the Capitol with the explicit intention of "getting in that building." As they walked through the National Mall, both Sparks and Howe visibly wore protective gear under their jackets. Sparks stood beside Howe, in the pepper spray-saturated air in the scaffolding surrounding the Northwest Stairs, as Howe donned goggles and a gas mask to protect against the tear gas. This demonstrates Sparks's knowledge and intent because Sparks witnessed this up close as it was happening; the evidence provides a firm foundation that Sparks, traveling with Howe as a duo, was aware of his surroundings including Howe's preparations and actions. *See United States v. Rhine*, No. CR 21-0687 (RC), 2023 WL 2072450, at *10 (D.D.C. Feb. 17, 2023) (properly admitting evidence of the riot as a whole but limiting evidence of purported inaction of law enforcement to instances where a proper foundation is laid, that is, where the defendant was "adequately nearby" at "the correct time") (citing Mem. & Order at 3, *United States v. Williams*, No. 21-cr-377 (D.D.C. June 8, 2022), ECF No. 87).

### III. Sparks's Communications with Howe Demonstrate His Planning, Preparation, and State of Mind

Communications between Sparks and his co-defendant and travel companion, and evidence of their joint planning efforts and prior weekend in Washington, D.C., are all relevant and in no way unfairly prejudicial. Each of the items Sparks objects to should be admitted.

#### A. Records from GoFundMe of Howe's Fundraising

Howe raised money for the trip he and Sparks planned for January 6 using a crowdfunding website known as GoFundMe. To solicit funds, on December 26, 2020, he described that "it's taken a lot of planning just to get me and a few other Patriots in line to go." Ex. 701. Sparks was first among those "other Patriots." This was made clear about a week later, on January 3, 2021, when Sparks posted a link to Howe's fundraising site to his own Facebook page, so that possible

14

supporters would donate money.  Ex. 334.  Howe's fundraising page (which raised a total of $50 from one supporter) is clearly relevant to Sparks's planning for the event.  The fact that Sparks and Howe "t[ook] a lot of planning" to go to D.C. for January 6, and that they began planning at least as early as December 26, 2021, is all relevant to Sparks's knowledge and intent that day.  There is nothing unfairly prejudicial about this evidence under Rule 403, and it has no bearing on Sparks's character under Rule 404.  It should be admitted.

      B.      **Howe's Calendar Entry Reflecting Hotel Stay in December 2020**

Howe's cell phone was searched by the FBI in October 2022.  Among the files located on the phone was a calendar entry for a reservation at the Holiday Inn Washington Capitol – National Mall from December 12 to 14, 2020.  Ex. 712.  Among the files discovered on Sparks's cell phone and in his Facebook records are photos of Sparks and Howe together in Washington, D.C. that same weekend.  This record will simply corroborate that Howe and Sparks traveled together for the December 2020 rally, which they attended together.  It is relevant to Sparks's state of mind and planning for January 6, and nothing about this record is unfairly prejudicial under Rule 403.  It should be admitted.

      C.      **Text Messages Between Sparks and Howe**

Also located on Howe's cell phone in the October 2022 search were a handful of text messages between Sparks and Howe, exchanged between November 2021 and October 2022.  Ex. 713.  As described above, in these messages, Howe and Sparks routinely discussed the 2020 election.  Sparks described a sales call where he discussed the election being stolen, claimed that he "truly believe[s]" that court cases "are going to expose the fraudulent election[,]" and commented specifically on some of those court cases, as late as July 2022.  Finally, on October 21, 2022, Sparks told Howe he was selling his trailer because he was "Going to jail lol[.]"  Howe was approached by the FBI and his phone seized just a few days later.

This text message exchange is essential evidence of Sparks's state of mind and his intent. Even with the benefit of hindsight, after the gravity of the events of January 6 were fully known to him, Sparks continued to promote theories of election interference and discuss the ongoing legal battles to invalidate the results of the 2020 election. Sparks's comments demonstrate his continued commitment to the mission he had on January 6, to stop Congress from certifying the election results. As the D.C. Circuit clarified in *Torres*, evidence of the defendant's state of mind "might include a defendant's conduct before, during, or after the charged criminal acts[.]" 894 F.3d at 311. The fact that Sparks's texts occurred long after the events of January 6, 2021, do not lessen their relevance to this case; in many ways, his continued adherence to the same goals helps to confirm his intentions before and on that day. These text messages should be admitted.

## CONCLUSION

For all the reasons discussed above, the government respectfully requests that the Court deny Sparks's motion in limine.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ *Emily W. Allen*
EMILY W. ALLEN, Cal. Bar No. 234961
SONIA MITTAL, Il. Bar No. 6314706
Assistant United States Attorneys
601 D Street NW
Washington, DC 20530
emily.allen@usdoj.gov
(907) 271-4724